**MARKET STREET ASSOCIATES LIMITED PARTNERSHIP, a Wisconsin limited partnership, and William Orenstein, as general partner of Market Street Associates Limited Partnership, Plaintiffs–Appellants,**

v.

**Dale FREY, Arthur Bahr, John H. Myers, et al., Defendants–Appellees.**

**No. 93–2119.**

United States Court of Appeals, Seventh Circuit.

Argued Dec. 2, 1993.

Decided April 13, 1994.

Michael B. Apfeld, Jane C. Schlicht, Godfrey & Kahn, John A. Busch, David A. Krutz, Michael, Best & Friedrich, Milwaukee, WI, Arnold I. Burns (argued), Proskauer, Rose, Goetz & Mendelsohn, New York City, for plaintiffs-appellants.

James W. Greer (argued), Bruce G. Arnold, Barbara J. Janaszek, Whyte & Hirschboeck, Milwaukee, WI, for defendants-appellees.

Before WOOD, Jr., ESCHBACH, and ROVNER, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

In this appeal we are reacquainted with this diversity case which was before another panel of this court two years ago. *See Market Street Assoc. Ltd. Partnership v. Frey,* 941 F.2d 588 (7th Cir.1991). Plaintiffs Market Street Associates Limited Partnership ("Market Street")[1] and William Orenstein, its general partner, seek specific performance of a contract between them and defendants General Electric Pension Trust and its trustees (collectively referred to as the

"Trust").[2] Plaintiffs now appeal from a second judgment entered for the defendants.

In our first visit we reversed the district court's order granting summary judgment and held that genuine issues of material fact existed as to whether Market Street breached its duty to perform the contract in good faith when communicating with the Trust regarding potential financing and sales opportunities. *Id.* at 596–97. We remanded this case to the district court for a very specific purpose: to determine whether Market Street, through its representative Orenstein, acted in good faith when performing the contract. *Id.* at 596. Specifically, the district court was to examine Orenstein's state of mind during the events of this case and assess the credibility of the witnesses. *Id.* at 597. Following our instructions, the district court held that Orenstein breached its duty to use good faith when dealing with the Trust and that Market Street is not entitled to specific performance.

## I. BACKGROUND

The events of this case arise out of a sale and leaseback arrangement in which J.C. Penney Company sold four parcels of real property to the Trust which the Trust then leased back to Penney for a term of twenty-five years. The purpose of the deal was to finance Penney's growth.

Approximately twenty years later, on October 30, 1987, Penney assigned its leasehold interest in the four properties to Market Street. Only one of these four properties, the West Allis property, is involved in this case. After Market Street acquired the West Allis property, Phar–Mor, a drugstore chain, contacted it about opening a store in the shopping center located on the property. To complete a deal with Phar–Mor, Market Street would have to improve the property by building a store. Financing improvements to the property were governed by terms of the original contract between J.C. Penney and the Trust. If the lessee wanted

1. Market Street is a Wisconsin partnership engaged in the business of real estate development.

2. Defendant General Electric Pension Trust ("the Trust") is a trust created for the benefit of the

employees of General Electric Co., its divisions and subsidiaries. The remaining defendants are trustees of the trust being sued in their representative capacities.

to improve the property, the lessee was first required to ask the lessor to provide the needed financing. Under the contract the Trust agreed "to give reasonable consideration to providing the financing of such additional Improvements and Lessor and Lessee shall negotiate in good faith concerning the construction of Improvements and the financing by Lessor of such costs and expenses." Then, if the lessor declined the invitation, the lessee was authorized to repurchase the property at a price determined by a specific formula.[3]

In 1988 Market Street and the Trust negotiated over the financing of improvements on, or possible sale of, the West Allis property. They did not reach an agreement, and Market Street filed this suit for specific performance of the contract to force sale of the property under the formula contained in paragraph 34. Whether Market Street acted in good faith when negotiating financing terms and, thus, whether they are entitled to specific performance were the issues faced by the district court on remand.

Following a bench trial the district court made key findings of fact concerning the events that occurred between Market Street and the Trust during the negotiation process. These findings are the basis upon which the district court determined that Market Street did not perform the contract in good faith and, thus, was not entitled to specific performance of the contract. The findings of fact focus on the contents and dates of a series of letters and phone calls between Orenstein and David Erb, an investment manager in the real estate department at General Electric Investment Corporation ("Investment Corp."). Investment Corp. serves as the investment advisor to the Trust's Trustees.

Before discussing financing options with the Trust, Market Street inquired into the possible purchase of the property. Market Street wanted to purchase the property because it determined that it would then be easier to finance and eventually sell the property. Orenstein first notified the Trust by a June 8, 1988, letter to Erb stating that he wished to "open a discussion and perhaps a negotiation" regarding Market Street's possible purchase of the West Allis property. Erb does not remember receiving Orenstein's letter, but testified that his normal practice was to give a copy of such letters to an analyst to review the file so that a response could be prepared. When Erb did not respond to this letter, Orenstein contacted Erb. Erb told Orenstein that someone would get back to him, and then referred the matter to Gregory Fletcher, an investment analyst.

Fletcher called Orenstein on June 29 and told him that the Trust was willing to sell the West Allis property for $3 to $3.1 million. This price was significantly more than the calculated purchase price under paragraph 34 of the lease,[4] though Orenstein testified that he does not remember whether he had calculated the price under paragraph 34 at the time of this correspondence. After receiving Fletcher's call, Orenstein felt the Trust had no interest in continuing negotiations with Market Street.

Market Street then turned its eye towards financing options. In a July 28, 1988 letter to Erb, Orenstein tried to determine whether

3. The paragraph in issue states:

    34. *financing additional improvements.* From time to time during the basic term, Lessee may request Lessor to finance the costs and expenses of construction of additional Improvements upon the Premises. Such request shall set forth in reasonable detail the estimated amount of such costs and expenses, such amount to be not less than $250,000. Upon the receipt of each such request, Lessor agrees to give reasonable consideration to providing the financing of such additional Improvements and Lessor and Lessee shall negotiate in good faith concerning the construction of such Improvements and the financing by Lessor of such costs and expenses.... If Lessor and Lessee shall be unable to agree on the terms of financing of any such additional Improvements with estimated costs and expenses of $250,000 or more, Lessee may within 60 days thereafter give notice of its election to repurchase the Premises at a price equal to the unamortized cost of the Premises to Lessor as of the immediately preceding Basic Rent payment date and accrued interest on such amount at the rate of 6% per annum from such date to the date of purchase.

4. The district court did not calculate the price under paragraph 34. Statements contained in the briefs suggest that this price was approximately $1.1 million.

the Trust was interested in providing financing for improvements to the property. The letter states:

Market Street Associates is in the process of negotiating a lease with Phar–Mor, Inc. for an addition to be built at the [West Allis property].... The cost of the addition is ... $2,000,000.

We propose to begin construction in September and are presently investigating financing opportunities.... We would like to discuss the financing with you and would appreciate it if you would call us as soon as possible.

On behalf of the Trust, in an August 10, 1988 letter, Erb rejected this request for financing because it did not meet the Trust's current investment criteria.[5] Before receiving the Trust's rejection letter, on August 16, 1988, Orenstein wrote a second letter to Erb regarding the proposed financing. He wrote:

By letter dated July 28, 1988, we advised you that Market Street Associates was negotiating a lease with Phar–Mor, Inc. for an addition to the captioned [West Allis] shopping center.... Although we requested that you call us as soon as possible, to date we have had no response. As in all real estate transactions, and especially in this one, timing is crucial.

The purpose of this letter is to ask again that you advise us immediately if you are willing to provide the financing pursuant to the lease. If you are willing, we propose to enter into negotiation to amend the ground lease appropriately. If you are unwilling to provide the financing, please let us know that so that we can proceed accordingly.

This letter did not refer to paragraph 34 or otherwise mention the buyout clause. This omission, Orenstein testified, is a result of an office practice never to refer to specific lease provisions for fear of referring to the wrong provision or neglecting to reference all relevant portions of the contract or lease.

On August 17, Orenstein received the Trust's August 10 form rejection letter, prompting Orenstein to respond by an August 22 letter in which he expressed disappointment with the Trust's rejection and stated that Market Street would attempt to obtain financing from another source. Orenstein did not mention paragraph 34 until September 27, 1988 when he sent Erb a letter, written by counsel, indicating that Market Street was exercising its option to purchase under that paragraph. Erb testified that it was not until he received this letter that the Trust became aware of paragraph 34.

On December 15, 1988, Erb and Orenstein met in Milwaukee and Erb offered to negotiate financing for the deal. Orenstein refused this offer stating that Market Street had already made previous commitments. When the date for closing arrived, the Trust refused to convey the property. In response, Market Street filed this suit for specific performance of the contract under paragraph 34 asking the court to command sale of the property.

## II. ANALYSIS

Following a bench trial we review the district court's factual determinations for clear error and its legal conclusions *de novo*. *International Union of Operating Engineers, Local Union 103 v. Indiana Constr. Corp.*, 13 F.3d 253, 255–56 (7th Cir.1994); *Bennett v. Local Union No. 66*, 958 F.2d 1429, 1433 (7th Cir.1992). The reason for the difference in these standards is simple. Factual determinations are made by the district court after having an opportunity to receive evidence presented by both sides and assess the credibility of witnesses, thus placing the district judge in a better position to find the truth. *See Anderson v. Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1984) ("When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's under-

---

5. The real estate department of General Electric Investment Corporation received hundreds of financing proposals in 1988 and routinely rejected proposals involving less than $10 million by a form letter.

standing of and belief in what is said."); *District No. 8, Int'l Ass'n of Machinists v. Clearing,* 807 F.2d 618, 622–23 (7th Cir. 1986). On legal issues, however, we are less deferential because we stand on equal ground with the district court to understand and apply the law. *See Salve Regina College v. Russell,* 499 U.S. 225, 233–34, 111 S.Ct. 1217, 1222, 113 L.Ed.2d 190 (1991).

■■■ Wisconsin law, which governs this case, implies the duty of good faith into every contract. *In Re Estate of Chayka,* 47 Wis.2d 102, 107, 176 N.W.2d 561 (1970). In our first opinion we discussed at length the meaning of the duty of good faith in contract law. *Market Street,* 941 F.2d at 593–96. Courts use good faith as a protection device to approximate terms not actually contained in the contract, but those that would have been included "expressly if at the time of making the contract [the parties] had had complete knowledge of the future and the costs of negotiating and adding provisions to the contract had been zero." *Id.* at 596. During the performance of a contract, this duty prohibits one party from taking "deliberate advantage of an oversight by your contract partner concerning his rights under the contract." *Id.* at 594. Here, the focus of the good faith inquiry should be on the correspondence and conversations that occurred between the parties during the summer and fall of 1988. "The dispositive question in the present case is simply whether Market

Street Associates tried to trick the pension trust and succeeded in doing so. If it did, this would be the type of opportunistic behavior in an ongoing contractual relationship that would violate the duty of good faith performance however the duty is formulated." *Id.* at 596. This is a question of fact under Wisconsin law and we review the district court's holding for clear error. *Amoco Oil Co. v. Capitol Indem. Corp.,* 95 Wis.2d 530, 291 N.W.2d 883, 890 (Ct.App.1980); Russell A. Eisenberg, *Good Faith Under the Uniform Commercial Code—A New Look At An Old Problem,* 54 Marq.L.Rev. 1, 15 (1971).[6] As we review the facts found by the district court we note that the plaintiffs do not contest any of the district court's findings, only the conclusion or ultimate finding of fact that Orenstein intended to trick the Trust.

Three letters from Orenstein to Erb constitute the extent of Market Street's sharing of information with the Trust, the contents of which are a sound basis upon which the district court determined that Market Street did not act in good faith.

Correspondence began on June 8 when Orenstein, in his letter to Erb, first offered to buy the West Allis property. After an exchange of letters and phone calls between Orenstein and other representatives of the Trust, the Trust offered to sell the property for $3 to $3.1 million dollars, an amount

---

**6.** In an effort to persuade us not to apply the clearly erroneous level of review, Market Street attempts to characterize the issue on appeal as one of causation: Did Orenstein's failure to specifically refer to paragraph 34 cause the Trust to fail to honor its obligation to consider additional financing? Market Street argues that the Trust also had an obligation to negotiate in good faith, and that it failed to do so even after learning about paragraph 34 because it was operating under the mistaken legal belief that paragraph 34 was personal to Penney, and that Market Street had no right to act under this paragraph. Because of this belief, the Trust has not demonstrated that they would have provided financing even if Market Street had provided notice of paragraph 34.

There are two problems with Market Street's argument. First, the issue on remand was Orenstein's state of mind and good faith, not causation. We held that this determination could not be made on summary judgment because of its factual nature. Second, the district court did

find that in December, 1988, the Trust was willing to negotiate financing, and Market Street has not presented any evidence indicating that this finding of fact is clearly erroneous. The first clear indication to the Trust that Market Street was acting under paragraph 34 came in the September 27 letter when plaintiffs stated that they were exercising their option to purchase the property. Plaintiffs argue that after receiving the September 27 letter, the Trust had the "last clear chance" to correct this mistake. We do not give credence to this argument for, as we have already mentioned, the Trust offered to provide financing on December 15 but was rejected.

We also reject plaintiffs' argument that because the good faith defense was not raised until the motions for summary judgment, this is evidence that the Trust was not tricked, and instead we should believe that the Trust was not willing to negotiate financing. We do not know whether the Trust would have negotiated financing in the summer of 1988; they were never given the opportunity to do so.

significantly above the paragraph 34 price. Once Orenstein realized that Market Street would not be able to purchase the West Allis property at an acceptable price, he turned to the option of financing. Orenstein's July 28 letter to Erb was the first request to discuss financing the $2 million in proposed improvements to the property. The Trust was not interested in financing projects of less than $10 million and routinely rejected such requests. Accordingly, the Trust sent its form rejection letter on August 10.

But before receiving the August 10 letter, Orenstein sent a letter dated August 16 stating "[t]he purpose of this letter is to ask again that you advise us immediately if you are willing to provide the financing pursuant to the lease." While this is the first time Orenstein mentions the lease, he does not reference paragraph 34 or otherwise identify the buyout provision. One day later, on August 17, Orenstein received the August 10 rejection, and, as found by the district court, at that time knew the Trust was unaware of paragraph 34. Orenstein then sent another letter on August 22 which stated:

> Although your letter in connection with the captioned matter was dated August 10, 1988, we didn't receive it until August 17th. That was a day after our August 16th letter addressed to you. Apparently the two letters crossed.

> Anyway, we were sorry to hear that GE is not interested in the financing of our proposed addition in West Allis. We have opened negotiations with Great–West and First Interstate Bank who, as you know, were the principal lenders in our acquisition of the property from J.C. Penney.

Orenstein wrote this August 22 letter before giving Erb a chance to respond to the August 16 letter, thereby seizing the opportunity to take advantage of the August 10 rejection letter. He informed the Trust that Market Street was obtaining financing from another source and in doing so, gave the Trust a reason to conclude that they need not take further action or respond to the August 16 letter. After receiving the August 22 letter, as far as the Trust knew, the matter was closed. It was not until September 27 that the trap was sprung and Market Street disclosed its intention to purchase the property pursuant to paragraph 34.

Based on this scenario, the district court found that once Orenstein received the form rejection letter, he knew that the Trust was not operating under paragraph 34, thus implying that Market Street had tried to trick the Trust in violation of the duty of good faith. We see no clear error in this finding of fact, and the district court's judgment is supported by substantial evidence. In fact, plaintiffs agree entirely with these factual findings. Instead plaintiffs complain that the district court did not make a determination about Orenstein's state of mind and intent, the specific purpose for which this Court remanded the case. The district court did, however, make this finding when it concluded that after receiving Erb's August 10 letter, "Orenstein knew that the Trust had not considered paragraph 34." Mem.Op. at 9. The district court further stated:

> While Orenstein initially assumed that the Trust would review the lease and make its determination as to whether it should provide financing to Market Street in light of paragraph 34, he subsequently recognized that the Trust was not operating under paragraph 34. While Orenstein knew this fact, he did not bring the matter to the Trust's attention, and continued to write ambiguous letters, until he wished to utilize the purchase option, thereby purchasing the property at a discounted cost. By so doing, this court concludes that Orenstein breached his duty to use good faith in his dealings with the Trust, and Market Street is not entitled to specific performance.

*Id.* Implicit in these statements is the finding that Orenstein intended to trick the Trust by implementing a plan designed to acquire a valuable piece of real property at a price substantially below its market value. Even though this finding is taken from the "Conclusions of Law" section of the district court's opinion, it is still a finding of fact, and we will not remand the case simply to allow the district court to extract the factual deter-

minations and place them in the fact section.[7] As evidenced by the district court's numerous citations to our first opinion, it clearly knew its task on remand, followed our instructions, and made the appropriate findings. We will not remand this case again simply to allow the district court to use the explicit language sought by plaintiffs.

As plaintiffs' last argument, they contend that their conduct did not constitute a breach of good faith under the facts found by the district court, focusing our attention on the correspondence that occurred in August, 1988. Plaintiffs argue that even accepting the district court's finding that Orenstein knew the Trust was ignorant of paragraph 34 after receiving the August 10 rejection letter, that this mistake of fact was corrected by Orenstein's August 16 letter to Erb specifically referring to the lease. "Unless one concludes that Orenstein believed that Erb would not even read the letter of August 16, 1988, one cannot conclude that Orenstein believed that after August 19, 1988 [the Trust] was ignorant that financing was being sought pursuant to the Lease." Appellants' Brief at 22–23. This argument misses the mark. It is not the lease that should have been referenced but instead paragraph 34. Alternatively, Orenstein could simply have indicated Market Street's intention to buy the property at the discounted price if the Trust declined the request for financing. Orenstein recognized the importance and implications of paragraph 34 and knew or should have known that the Trust was unaware of the clause. By remaining silent about paragraph 34, the district court determined that he intended to trick the Trust, thus violating Market Street's duty of good faith in performing the contract. The district court could reasonably conclude that the language of Orenstein's letters and the failure to men-

tion paragraph 34 specifically or describe its consequences was intentionally designed to keep the Trust blind and stupid, and that this constitutes a breach of the implied duty of good faith in performance of a contract. It is not the failure to specifically refer to a part of the lease that constitutes the breach, but instead the failure to mention what Market Street clearly preferred to do: purchase the West Allis property at the discounted price calculated under paragraph 34.

We find no clear error in the district court's finding that Orenstein intended to deceive the Trust through a series of vague and ambiguous letters, and took advantage of the Trust's unilateral, inadvertent mistake of fact, thereby violating its duty of good faith in performance of the contract. The record fully supports these findings. Specific performance is therefore not appropriate and the judgment for the defendants is

AFFIRMED.

---

**7.** During oral argument plaintiffs' counsel directed our attention to several items contained in Orenstein's testimony, but not in the district court's findings of facts. Specifically Orenstein testified that it was inconceivable to him that the Trust did not review the lease and paragraph 34, and that he believed the Trust had reviewed the lease to determine the $3 to $3.1 million purchase price. We can think of at least two possible explanations for these omissions.

First, the district court may have rejected Orenstein's testimony as not credible. Moreover, this testimony is purely speculative and not necessarily inconsistent with the district court's finding that once Orenstein received Erb's August 10 rejection letter, he knew that the Trust was not operating under paragraph 34 of the lease. Even though Orenstein initially may have believed the Trust necessarily had to review paragraph 34 to arrive at the $3 million purchase price, later he could have realized the Trust's error during the course of correspondence.